AF Approval __JH__                                  Chief Approval __CK__

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                                           CASE NO. 6:23-cr-70-WWB-EJK

JOHN CAN UNSALAN

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, Margaret A. Moeser, Acting Chief of the Money Laundering and Asset Recovery Section ("MLARS") of the Criminal Division of the United States Department of Justice, and Jennifer Kennedy Gellie, Acting Chief of the Counterintelligence and Export Control Section ("CES") of the National Security Division of the United States Department of Justice, and the defendant, JOHN CAN UNSALAN, and the attorneys for the defendant, Vincent A. Citro, Esq. and Matthew P. Ferry, Esq., mutually agree as follows:

A.    **Particularized Terms**

    1.    Count Pleading To

The defendant shall enter a plea of guilty to Count Twelve of the Indictment. Count Twelve charges the defendant with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).

Defendant's Initials __JU__

2.     <u>Maximum Penalties</u>

Count Twelve carries a maximum sentence of twenty years' imprisonment, a maximum fine of $500,000, or twice the value of the monetary instrument or funds involved, whichever is greater, a term of supervised release of not more than three years, and a special assessment of $100. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3.     <u>Elements of the Offense</u>

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty. The elements of Count Twelve are as follows:

<u>First</u>: Two or more people agreed to try to accomplish a common and unlawful plan to violate 18 U.S.C. § 1956(a)(2)(A), namely:

(a) To transport, transmit, or transfer a monetary instrument or money from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States; and

(b) To do so with the intent to promote the carrying on of specified unlawful activity, namely violations of the International Emergency Economic Powers Act (50 U.S.C. § 1705(a) & (c)).

2

Defendant's Initials _JG_

<u>Second</u>:   The defendant knew about the plan's unlawful purpose and voluntarily joined in it.

4.    <u>Counts Dismissed</u>

At the time of sentencing, the remaining counts against the defendant, Counts One through Eleven and Counts Thirteen through Twenty-Two, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

5.    <u>No Further Charges</u>

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida, MLARS, and CES (collectively, "the Offices") agree not to charge the defendant with committing any other federal criminal offenses known to the Offices at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.    <u>Guidelines Sentence</u>

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to

Defendant's Initials _JLA_

3

withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

7.      Adjusted Offense Level - Joint Recommendation

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant agree to jointly recommend to the Court that the defendant's adjusted offense level be calculated as set forth below:

| Guideline | Description | Levels |
|---|---|---|
| USSG § 2M5.1<br>USSG § 2S1.1 | Base Offense | 26 |
| USSG § 2S1.1(b)(2)(B) | Conviction under 18 U.S.C. § 1956 | +2 |
| USSG § 2S1.1(b)(3) | Section 2S1.1(b)(2)(B) applies and the offense involved sophisticated laundering | +2 |
| USSG § 3B1.1 | Organizer, leader, manager, or supervisor not described in § 3B1.1(a) or (b) | +2 |
| USSG § 3E1.1 | Acceptance of Responsibility | -3 |
| Total Adjusted Offense Level | | 29 |

The parties understand that such a joint recommendation is not binding on the Court, and if not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

Defendant's Initials _J U_

4

8.    <u>Acceptance of Responsibility - Three Levels</u>

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to move pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the recommendation of a downward adjustment of a third level for acceptance of responsibility rests solely with the Offices, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

Defendant's Initials  JU

9.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(1), whether in the possession or control of the United States, the defendant or defendant's nominees.

The assets to be forfeited specifically include the $160,416,948.56 in proceeds and funds involved in the money laundering conspiracy that the defendant admits he obtained as the result of this conspiracy to which the defendant is pleading guilty.  The defendant acknowledges and agrees that: (1) the defendant obtained this amount as a result of the commission of this offense, and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence.  Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offense of conviction.  The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offense and consents to the entry of the forfeiture order into the Treasury

Defendant's Initials ___

Offset Program.  The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government.  Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will

Defendant's Initials _____

7

satisfy the notice requirement and will be final as to the defendant at the time it is entered.  In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before the defendant's sentencing.  To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the

Defendant's Initials JU

8

defendant's sentencing.  In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

9

Defendant's Initials JG

B.     **Standard Terms and Conditions**

1.     Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a cashier's check, certified check, or money order to the Clerk of the Court in the amount of $100, payable

Defendant's Initials

10

to "Clerk, U.S. District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

2.     Supervised Release

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.     Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.     Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any

Defendant's Initials _____

11

misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.   Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the Offices within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the Offices to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any

Defendant's Initials _____

recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the Offices to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

      6.    <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's

Defendant's Initials _____

sentence, whether or not such decision is consistent with the government's recommendations contained herein.

      7.    <u>Defendant's Waiver of Right to Appeal the Sentence</u>

      The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

      8.    <u>Middle District of Florida Agreement</u>

      It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida as well as the Money Laundering and Asset Recovery Section of the Criminal Division of the

Defendant's Initials _____

U.S. Department of Justice and the Counterintelligence and Export Controls
Section of the National Security Division of the U.S. Department of Justice,
and cannot bind other federal, state, or local prosecuting authorities, although
the Offices will bring defendant's cooperation, if any, to the attention of other
prosecuting officers or others, if requested.

9.  <u>Filing of Agreement</u>

This agreement shall be presented to the Court, in open court or <u>in
camera</u>, in whole or in part, upon a showing of good cause, and filed in this
cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.  <u>Voluntariness</u>

The defendant acknowledges that defendant is entering into this
agreement and is pleading guilty freely and voluntarily without reliance upon
any discussions between the attorney for the government and the defendant and
defendant's attorney and without promise of benefit of any kind (other than the
concessions contained herein), and without threats, force, intimidation, or
coercion of any kind. The defendant further acknowledges defendant's
understanding of the nature of the offense or offenses to which defendant is
pleading guilty and the elements thereof, including the penalties provided by
law, and defendant's complete satisfaction with the representation and advice
received from defendant's undersigned counsel (if any). The defendant also

understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   <u>Factual Basis</u>

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are

Defendant's Initials JU

16

true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12. <u>Entire Agreement</u>

This plea agreement, including Exhibit A, constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials ___

13.   <u>Certification</u>

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 25th day of _September_, 2023.

JOHN CAN UNSALAN
Defendant

ROGER B. HANDBERG
United States Attorney

By: _____
Chauncey A. Bratt
Assistant United States Attorney

Vincent A. Citro, Esq.
Attorney for Defendant

By: _____
Cherie L. Krigsman
Chief, MDFL National Security Section

Matthew P. Ferry, Esq.
Attorney for Defendant

MARGARET A. MOESER
Acting Chief, MLARS
U.S. DOJ, Criminal Division

By: _____
Sean O'Dowd, Trial Attorney

JENNIFER KENNEDY GELLIE
Acting Chief, CES
U.S. DOJ, National Security Division

By: _____
Emma Ellenrieder, Trial Attorney

18

Defendant's Initials _____

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:23-cr-70-WWB-EJK

JOHN CAN UNSALAN

PERSONALIZATION OF ELEMENTS

First:      Did two or more people agree to try to accomplish a
            common and unlawful plan to violate 18 U.S.C. §
            1956(a)(2)(A),  namely:

            (a) To transport, transmit, or transfer a monetary
                instrument or money from a place in the United
                States to or through a place outside the United
                States, or to a place in the United States from or
                through a place outside the United States; and

            (b) To do so with the intent to promote the carrying
                on of specified unlawful activity, namely
                violations of the International Emergency
                Economic Powers Act (50 U.S.C. § 1705(a) &
                (c))?

Second:     Did you know about the plan's unlawful purpose
            and voluntarily join in it?

Defendant's Initials _JCU_                    19

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:23-cr-70-WWB-EJK

JOHN CAN UNSALAN

## FACTUAL BASIS

### IEEPA and the Ukraine-/Russia-Related Sanctions Regulations

The International Emergency Economic Powers Act ("IEEPA")
provides the President of the United States with authority "to deal with any
unusual and extraordinary threat, which has its source in whole or in substantial
part outside the United States, to the national security, foreign policy, or
economy of the United States." Pursuant to that authority, the President may
declare a national emergency through executive orders that have the full force
and effect of law. Among other things, IEEPA empowers the President to

> investigate, block . . . regulate, . . . prevent or prohibit, any
> acquisition, holding, withholding, use, transfer, withdrawal,
> transportation, importation or exportation of, or dealing in, or
> exercising any right, power, or privilege with respect to, or
> transactions involving, any property in which any foreign country
> or a national thereof has any interest by any person, or with respect
> to any property, subject to the jurisdiction of the United States

and to "issue such regulations . . . as may be necessary for the exercise of the
authorities granted" by IEEPA. IEEPA further provides that it is a crime to

Defendant's Initials 

20

willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to IEEPA.

In March 2014, pursuant to IEEPA, the President issued Executive Orders 13660, 13661, and 13662 (the "Executive Orders") authorizing the Secretary of the Treasury to block all property and interests in property of persons involved in the Russian Federation military invasion of the Crimea region of Ukraine, including persons operating in the defense and related materiel sector of the Russian Federation.

Pursuant to the Executive Orders, the Secretary of the Treasury promulgated the Ukraine-/Russia-Related Sanctions Regulations (Title 31, Code of Federal Regulations, Part 589), which generally prohibit any U.S. person from conducting business with persons or entities on the U.S. Department of the Treasury's Specially Designated Nationals and Blocked Persons List ("SDN"), which is managed by the Treasury Department's Office of Foreign Assets Control ("OFAC"). Specifically, the Ukraine-/Russia-Related Sanctions Regulations state that:

> The prohibitions . . . of this section include prohibitions on the following transactions: (1) The making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to paragraph (a) of this section; and (2) The receipt of any contribution or provision of funds, goods, or services from any person whose property and interests in property are blocked pursuant to paragraph (a) of this section.

21

Defendant's Initials 

The regulations specify that "the term *person* means an individual or entity."

The Ukraine-/Russia-Related Sanctions Regulations incorporate by reference the prohibitions of the Executive Orders, which bar:

> (a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and (b) the receipt of any contribution or provision of funds, goods, or services from any such person.

The Executive Orders further prohibit any transaction that evades or avoids the prohibitions in the orders and any conspiracy to violate these prohibitions.

On July 30, 2015, OFAC designated Sergey Vitalievich Kurchenko ("Kurchenko") as an SDN and blocked his property and interests in property. In the absence of a license to the contrary, U.S. persons are prohibited from contributing funds, goods, or services to Kurchenko or for his benefit. Similarly, absent such a license, U.S. persons are prohibited from receiving any contribution of funds, goods, or services from Kurchenko. OFAC designated Kurchenko for being responsible for or complicit in misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine. On January 26, 2018, OFAC designated, *inter alia*, related company Kompaniya Gaz-Alyans, OOO ("Gaz-Alyans") for having acted or purported to act for or on behalf of, directly or indirectly, the so-called Donetsk People's Republic ("DPR") and the so-called Luhansk People's Republic ("LPR"), which are in

22

Defendant's Initials _JU_

the Donbass region of Ukraine. OFAC noted at the time that "Gaz-Alyans, OOO . . . is controlled by Sergey Kurchenko."

### Background and Total Value of Sanctioned Transactions for which UNSALAN is Responsible

Metalhouse, LLC was registered in the State of Florida as a Limited Liability Company on February 2, 2014, and listed its registered agent as JOHN CAN UNSALAN ("UNSALAN"), who also served as an Authorized Member for Metalhouse. Before UNSALAN's arrest in April 2023, Metalhouse, which was located within the Middle District of Florida, operated in the steel industry by trading and distributing raw steel-making materials globally.

Between 2018 and 2021, UNSALAN, both in his individual capacity, and through Metalhouse, which he controlled, willfully helped carry out and facilitate business transactions that Metalhouse engaged in with companies that UNSLAN knew were owned and controlled by Sergey Kurchenko, an oligarch located in Russia who had been designated by OFAC at the time as a Specially Designated National. More specifically, UNSALAN, his associate Sergey Karpushkin ("Karpushkin"), and others conspired to orchestrate and carry out a scheme to violate IEEPA by willfully conducting monetary transactions with and for the benefit of Kurchenko and entities owned and controlled by Kurchenko and willfully receiving metal products from Kurchenko and entities that UNSALAN knew were owned and controlled by Kurchenko, who

Defendant's Initials _JU_

23

UNSALAN knew had been designated by OFAC as an SDN, without first having applied for and received a license from OFAC. UNSALAN and Karpushkin both knew that an OFAC license was required and that they did not have such license to transact with Kurchenko and companies owned and controlled by Kurchenko. During the relevant period of on or about July 27, 2018, to on or about March 11, 2021, UNSALAN and Metalhouse provided funds totaling $157,189,912.09 to Companies A and B below pursuant to metal transactions.

### Companies A and B

One of these entities owned and controlled by Kurchenko with which UNSALAN and Karpushkin conducted metal transactions was a business incorporated in Hong Kong ("Company A") that maintained a bank account in Saint Petersburg, Russia. Another entity owned and controlled by Kurchenko with which UNSALAN and Karpushkin conducted business transactions was a business incorporated in Cyprus ("Company B"). UNSALAN and Karpushkin both knew that Company A and Company B were owned and controlled by Kurchenko, whom both UNSALAN and Karpushkin referred to as "Mr. K."

**UNSALAN and Karpushkin Were Willfully Doing Business with Company A and Company B, Despite Knowing that They Were Owned and Controlled by Kurchenko**

In approximately January 2019, UNSALAN, Karpushkin, and others known and unknown to the United States traveled to Moscow, Russia, and participated in an in-person meeting with Sergey Kurchenko about the business relationship and current balances of funds owed between Metalhouse, UNSALAN, and Karpushkin, on the one hand, and Kurchenko's companies, including Company A and Company B, on the other hand.

In or about August 2020, Karpushkin emailed an individual with the initials A.P. on an encrypted messaging service, explaining that Karpushkin was working with UNSALAN, and that they were purchasing goods through Company A from a "Mr. K," *i.e.*, Kurchenko, who owed them at least $21 million:

> Regarding our conversation yesterday, the company from which I am working with Mr. K is called Metalhouse. The front man of the company is Mr. Can[1] Unsalan. We are partners in this project. Mr. K officially confirms there is an unpaid balance of 21 million dollars (See their official data further in the text). In fact it is a little more but I suggest starting with their figures. We have an agreement that they will be paying one million dollars to us monthly (see the document below). They have been violating the agreement for twelve months already. I need to understand if it is realistic to return part of it / everything and how much the services will cost.

---

[1] "Can" is UNSALAN's middle name.

The words "front man" were in English while the rest of the message was in Russian. Karpushkin then sent A.P. two documents, one of which was a September 2019 addendum to a contract between Company A and Metalhouse.

On or about this same date in August 2020, Karpushkin sent via electronic message a copy of a May 22, 2020 letter from Metalhouse's General Manager and In-House Counsel to Company A with a carbon copy directed to "Sergey Vitalievich Kurchenko." The letter sought to reduce the amount Company A owed to Metalhouse under the same underlying contract.

By in or about February 2021, Company A's outstanding balance with Metalhouse, i.e., Metalhouse's total payments to Company A minus the value of goods shipped by Company A, had reached $26 million. On or about February 27, 2021, UNSALAN messaged a Russian national business associate, stating "I need your help because I have receivable from kurchrnko [sic] 26m$ and can't get anything do you know any one Strong in government to push him." Less than two weeks later, on or about March 11, 2021, Metalhouse forwarded to Company A personnel a table that showed Company A owing Metalhouse a balance of over $26 million.

UNSALAN engaged in these transactions with Company A despite knowing that the ultimate beneficiary of these transactions was Kurchenko, who had been designated as an SDN. For example, in or about August 2019,

Defendant's Initials _JU_

well after sanctions were imposed against Kurchenko on or about July 30, 2015, and Gaz-Alyans and Vneshtorgservis on or about January 26, 2018, UNSALAN emailed Metalhouse employees about Metalhouse's outstanding balances with, among others, Gaz-Alyans and Company A. In the e-mail, UNSALAN stated that the price of short billets, or semi-finished steel that is stored in rectangular bars, had been previously agreed upon with an officer appointed by Company A and that Kurchenko was now changing his mind about that price. He said that "[i]f Mr. Kurchenko is not agreeing on the price of short billets then he would have come to Istanbul himself and market the cargo himself to us." Likewise, in or about November 2019, UNSALAN sent a message to a business associate in which he stated that "We still do business with Kurchenko and we give chance to everyone." Similarly, in or about October 13, 2021, UNSALAN stated in an electronic communication to a business associate, in Turkish, that "[t]his time the last cargo from Kurchenko was loaded to you."

UNSALAN also knew that Gaz-Alyans and Company B were beneficially owned and controlled by Kurchenko. For example, in a message sent to a business associate on or about July 30, 2020, UNSALAN stated that "[a]s far as I know [your company] work[s] with Gaz All [Gaz-Alyans]. We work too." UNSALAN then sought to purchase pig iron from the business

Defendant's Initials _JU_

27

associate, despite knowing that the source of the pig iron was Gaz-Alyans. In an electronic communication he sent to a business associate on or about October 1, 2021, UNSALAN stated in Turkish that Company A, Company B, and Gaz-Alyans were "Kurchenko's companies."

### Between July 2019 and June 2020, UNSALAN/Metalhouse Willfully Conducted over $43 Million in Deals with Kurchenko via Company B

In or about June and July of 2019, Metalhouse entered into two contracts to buy metal products from Company B. Pursuant to these contracts (the "Company B Contracts"), between in or about July 2019 and in or about September 2019, Metalhouse paid Company B $10.53 million, and Company B delivered to Metalhouse three shipments totaling 19,950 tons of steel billets at a contracted price of $385 per ton, for a total value of $7.68 million. In or about September 2019, Metalhouse and Company B entered into an addendum to the Company B Contracts, signed by UNSALAN in his capacity as Director of Metalhouse, confirming that, as of September 12, 2019, Company B owed Metalhouse a balance of $2.84 million under the contracts.

Between in or about September 2019 and in or about April 2020, Metalhouse and Company B entered into at least fourteen purchase orders through which Metalhouse agreed to purchase an additional $34 million in metal products from Company B, including steel billets, pig iron, and wire rods. Pursuant to these purchase orders, between on or about September 19, 2019,

Defendant's Initials _J U_

and in or about June 2020, Metalhouse wired over $33.5 million to Company B. Company B, in turn, shipped a large number of metal products to Metalhouse. UNSALAN and Metalhouse made these payments and received these goods from Company B despite knowing that Company B was owned and controlled by Kurchenko, an SDN.

In a series of encrypted messages sent between in or about September 2020 and in or about July 2021, UNSALAN and a person associated with Kurchenko who acted as Kurchenko's intermediary (the "Kurchenko Intermediary" or "A.K.") repeatedly referred to Kurchenko both by name and as "Mr. K." In a message on or about April 6, 2021, UNSALAN stated that there were rumors "[t]hat Mr K [*i.e.*, Kurchenko] lost everything" and that "[w]e propose him to pay 1.9 million usd on behalf of [Company B] on April 19 as he promised . . . . Please let me know about payment for [Company B] . . . [a]s he promised." A.K. responded, "Ok, will ask Mr. K also about it." Similarly, on or about April 24, 2021, UNSALAN messaged A.K. to explain that "I'm expecting money [from Kurchenko], we paid you money, you got money and you didn't deliver products[.] [T]here are two solutions: 1) You pay money back 2) you load cargoes. Now you are delayed and we don't believe you can produce steel anymore, so we want option 1," *i.e.*, payment of the $1.9 million.

Similarly, in a September 2019 e-mail from UNSALAN to Karpushkin and others, UNSALAN stated that "In the meeting with Mr. K we agreed for balance [$]19'400'000 including [Company B] + [Company A] VS METALHOUSE + [Company A] VS [another company owned and controlled by UNSALAN] + DEMURRAGES." Elsewhere in the chain, in a message on which Karpushkin was copied, UNSALAN wrote "Long story short unless all numbers showing what we agreed with Mr. Kurchenko we will not sign anything."

### UNSALAN and Karpushkin Jointly Participated in the Transactions with Kurchenko Entities and Shared in Metalhouse's Profits

Between approximately August 21, 2019, and approximately July 7, 2020, Metalhouse agreed to seven purchase orders with Company A and twenty-one purchase orders with Company B. The Company A purchase orders were worth an approximate total of $9.9 million, while the Company B purchase orders were worth an approximate total of $53.1 million. UNSALAN signed each of the purchase orders, and Karpushkin was included in emails pertaining to each of these orders.

For example, on or about September 17, 2019, a Company B representative emailed UNSALAN and Karpushkin regarding their purchase of 14,000 metric tons of steel billets from Company B, stating "Dear John / Sergey, Please find attached new PO [purchase order] for 14,000 MT of Steel

Defendant's Initials

Billets countersigned by us." This email attached a purchase order bearing signatures and stamps from both Metalhouse and Company B memorializing the transaction.

As another example, on or about November 12, 2019, a business representative sent a purchase order to both UNSALAN and Karpushkin, in which Metalhouse had agreed to purchase $1,560,000 worth of wire rods from Company A.

In addition, on or about December 28, 2019, Karpushkin sent an email to Company B representatives, copying UNSALAN, among others, in which Karpushkin stated, "[a]s agreed earlier please find attached draft of the new PO [purchase order] for 10000 mt [metric tons] of pig iron out of January production. . . . If you have any remarks please let us know." The email attached a purchase order proposing that Company B sell $2,900,000 worth of pig iron to Metalhouse.

From in or about August 2017 to in or about January 2020, UNSALAN and Karpushkin sent each other several "profit sharing" spreadsheets. For example, in an August 2017 email titled "volgobalt 214 profit-," Karpushkin told UNSALAN, "I see our (you + me) profit, which is 50% from total net profit in amount of 28,803.26 USD, right? I assume we need to share 2846.38 mt * 5

USD/t = 14,231.9 USD with the guys and only balance amount of 14,571 .36 is actually our (you + me) real profit."

Similarly, in or about October 2019, UNSALAN sent to Karpushkin a spreadsheet titled "PROFIT CALCULATIONS / SERGEY K[ARPUSHKIN] – METALHOUSE." The first workbook within the spreadsheet, labeled "TOTALS," had a chart with three columns: "Vessel," "Product" and "Total." The "Total" column listed the dollar value of each shipment. The bottom of the spreadsheet then listed a total dollar value which appeared to be the total profit to be shared by Karpushkin, UNSALAN, and another co-conspirator. The second workbook within the spreadsheet, labeled with the name of a different trading company associated with Kurchenko, had a similar three-column chart. Below the chart, the spreadsheet stated the following:

| | |
|---|---|
| Outstanding Credit in ███████████ | $ (7,045,000.00) |
| 33% SERGEY KARPUSHKIN | $ (2,324,850.00) |
| 33% UNSALAN | $ (2,324,850.00) |
| 33% ████████ | $ (2,324,850.00) |

**UNSALAN was Knowledgeable of the U.S. Sanctions Regime**

UNSALAN and Karpushkin expressly discussed generating false and misleading certificates for sanctioned goods expropriated by the Russians from Ukraine that would suggest that the goods, in fact, originated in Russia. Specifically, on or about July 15, 2017, UNSALAN forwarded to Karpushkin

Defendant's Initials _JU_

an e-mail inquiry from a bank indicating that a letter of credit would likely be issued for a particular transaction so long as it did not involve sanctioned goods ("Hi John . . . I need to make you aware that any [letters of credit] involving shipments from or to Russia must be reviewed and approved by our Trade Controls area . . . I do not anticipate any problems as long as the transaction does not violate any current sanctions."). UNSALAN further indicated to Karpushkin that to bypass this issue, the supplier of the goods would need to doctor the certificates for the goods:

> We will declare the goods are made in Russia. Which mill will issue the MTC ["mill test certificate"] in case bank is asking for it? If it's Yankiyeve Iron and Steel Works Public Joint Stock Company (PJSC) – [it] means showing Makeyvka, do they have alternative way to provide MTC printed out by another mill in Russia.

Yanikiyeve (Yenakiyeve) and Makeyvka (Makiivka) are both located in the sanctioned Donetsk region of Ukraine. Karpushkin responded by stating that if this was for wire rod coils, he would need to "ask the guys," referencing the generation of false mill test certificates.

UNSALAN admitted to FBI agents in a January 11, 2022 interview that he subscribed to a monthly OFAC e-mail with updates to the sanctions list and that he checked the OFAC website for businesses and persons Metalhouse wanted to do business with, and for their beneficial owners, where he knew them). UNSALAN further admitted in interviews with the FBI, including in an

Defendant's Initials 

April 14, 2023 interview at the Orlando International Airport, that he knew that KURCHENKO was sanctioned by OFAC.

At all times relevant to the Indictment, UNSALAN knew that no individual or entity had obtained the necessary license or authorization from OFAC to engage in the above transactions with Kurchenko and entities owned and controlled by Kurchenko.

### UNSALAN and His Company, Metalhouse, Received $160,416,948.56 in Proceeds from the Offense

Pursuant to the conspiracy, between July 2, 2018 and March 18, 2021, UNSALAN and his company, Metalhouse, received a total of $160,416,948.56 in proceeds from third-party purchasers as a result of the sale of the goods acquired from the unlawful transactions with Company A and Company B. UNSALAN used most of these proceeds to pay for the metal products that he was purchasing from Company A and Company B, but he also retained millions of dollars in profits for his own personal use and to expand his business assets and opportunities.

### UNSALAN's Role as Leader/Organizer

UNSALAN organized and managed Metalhouse, the company that engaged in the illegal transactions. He also helped supervise the activities of Karpushkin, who knowingly assisted UNSALAN in engaging in the illegal transactions.

Defendant's Initials 

34

**Sophisticated Nature of Laundering Activities**

The metal transactions which UNSALAN caused Metalhouse to engage in were with shell corporations, Companies A and B, that had been created to conceal the fact that these corporations were controlled and beneficially owned by an SDN (Kurchenko). The transactions also were conducted using offshore financial accounts.

For example, on November 27, 2020, Metalhouse sent the euro equivalent of $1,065,407.95 from its Bank of America account in Orlando, Florida to a Bank of America branch in London, United Kingdom, for the benefit of Company A in Hong Kong via Company A's Russian bank. Metalhouse LLC is listed as the "Debit ID" and "Originator" for the transaction, Bank of America London is the "Credit ID," Company A in Hong Kong is the "Beneficiary," and Energomashbank PLC in St. Petersburg, Russia is the "Beneficiary Bank." Bank of America records show that, using the same series of bank transactions, Metalhouse made the following payments to Company A:

- $2,145,281.26 on December 4, 2020
- $887,414.11 on February 24, 2021
- $828,538.45 on March 8, 2021
- $982,643.61 on March 11, 2021

Defendant's Initials ___